[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This Memorandum addresses the claims and renders judgment in each of the above captioned actions. They were tried together because the claims they contain involve alleged conduct by the same parties. While the underlying claims in each case are separately discussed, the findings contained herein pertain to all three files. CT Page 9449
Joan Leggon, Executrix v. L.T. Machinery, Inc
Joan Leggon is the daughter of Anna Barden who died on March 27, 1996 while a resident of Plainville, Connecticut. In 1991, Mrs. Leggon arranged for her mother to move to Connecticut from Florida. At this juncture, Mrs. Barden was in poor health. She had suffered a stroke and was bedridden. In 1986, Mrs. Barden had executed a general power of attorney giving to Mrs. Leggon the authority to conduct financial transactions on her behalf Mrs. Leggon testified that she began to use this power once her mother relocated to Connecticut in 1991. Mrs. Leggon is the executrix and sole beneficiary of her mother's estate by reason of a will executed by Mrs. Barden in Plainville on May 2, 1994.
L.T. Machinery Sales, Inc. (L.T. Machinery), is a duly organized Connecticut corporation with a principal place of business in Plainville, Connecticut. Robert Leggon is the plaintiff's husband and the president of L.T. Machinery. As such, he is the corporation's chief executive officer.
The gravamen of the plaintiff's claim is that in 1991 her mother owned assets with a value of approximately seven hundred thousand ($700,000) dollars, and from 1991 to 1994, the plaintiff's decedent loaned funds to Mr. Leggon individually and to L.T. Machinery with a promise for repayment with interest, and that, despite demands, the defendants have failed to repay most of the funds the plaintiff claims were advanced by her mother. In separate counts, the plaintiff claims that the defendants have been unjustly enriched to her detriment and that the defendants intentionally misrepresented that Mrs. Leggon was a 50% owner of the corporation in order to induce the plaintiff's decedent to lend substantial monies to L.T. Machinery for it's benefit and/or that of Mr. Leggon. Specifically, Mrs. Leggon claims that Anna Barden paid three hundred thirty-eight thousand ($338,000) dollars on behalf of L.T. Machinery, seventy-one thousand, six hundred and fifteen ($71,615) dollars directly to L.T. Machinery, and the further sum of one hundred seventy-three thousand ($173,000) dollars on behalf of the Leggons.
An essential element of the plaintiff's claim is proof that Anna Barden actually advanced funds to L.T. Machinery and/or Mr. Leggon. A starting point would be evidence that Mrs. Barden, in fact, had substantial assets to lend. Mrs. Leggon testified that she kept detailed records of her mother's assets and her loans to L.T. Machinery, She claimed that she kept records of her mother's CT Page 9450 assets under the seat in her truck, and she kept records of the loan transactions in the former marital home. She asserted that the transaction records were stolen from the family residence on February 26, 1996, after she had moved from the home. This claim lacks proof. The innuendo that records which could substantiate her claim of funds advanced by her mother to L.T. Machinery were, in fact, taken by Mr. Leggon is no substitute for actual proof of the existence of the records.
During the trial, Mrs. Leggon produced no documentary proof that Mrs. Barden was ever aware of any of her funds being loaned to L.T. Machinery or to Mr. Leggon. Additionally, during the hearing on this matter, no significant documentary evidence of Mrs. Barden's assets was produced. It does appear that, at some point in time, Anna Barden possessed some certificates of deposit, the exact amount of which was not proven to the possessed some certificates of deposit, the exact amount of which was not proven to the court.[1] Additionally, it appears that Anna Barden had savings bonds with a principal value, at maturity, of approximately fifty thousand ($50,000) dollars. cf. Defendant's Exhibit III.
Compounding the plaintiff's issues of proof, was evidence of a sworn financial statement submitted by Anna Barden to a court in Florida in conjunction with her divorce in 1992 after she had moved to Connecticut. According to this document, dated October 13, 1992, Mrs. Barden's assets then consisted of a 1979 mobile home. Next to the itemization of this asset is the notation; "($ Borrowed from Daughter) to be repaid from monies from Home 2480 Beacon St. Port Charlotte, Fl." Plaintiff's Exhibit 55 Sworn Affidavit of Anna Barden dated October 13, 1992. In this same document, Mrs. Barden indicated that she had no cash, stocks, bonds, notes, jewelry, cash surrender value of life insurance, or any other assets. Id. In the liability portion of the document, Mrs. Barden indicated that she owed the sum of one hundred sixty-seven thousand, seven hundred ninety-five dollars and forty-seven ($167,795.47) cents to her daughter. Next to this amount, she noted; "$ Borrowed from Daughter to relocate, live, pay medical bills, etc." It is difficult to harmonize this affidavit with Mrs. Leggon's claim that in 1991 her mother had assets worth approximately seven hundred thousand ($700,000) dollars, and that she loaned substantial sums to L.T. Machinery between 1991 and 1995. Mrs. Leggon's facile claim at brief that "there are enough exhibits contained within the record to indicate that Anna Barden's financial affidavit. Ex. 55 was untrue" is no CT Page 9451 substitute for credible evidence refuting the assertions contained in the affidavit cf. Plaintiff Wife's Post-Trial Reply Memorandum in CV 97-0574875S.
That is not to say, however, that the court concludes that Anna Barden's affidavit was accurate. It is simply a significant impediment bearing on the plaintiff's burden of proof.
It appears, in fact, that Mrs. Leggon, used her power of attorney from her mother to co-mingle funds with her mother's, and utilized funds from her joint account with her mother for Mrs. Barden's needs, her needs, her husband's needs, and, on occasion, the needs of L.T. Machinery. There is no credible evidence that this arrangement was the product of any agreement with Mrs. Barden. Indeed, the record is devoid of any reliable evidence that Mrs. Barden was even aware that her funds had been joined with those of Mr. and Mrs. Leggon and L.T. Machinery. Through the activities of Mrs. Leggon, it appears that funds from accounts in her name with Anna Barden did, in fact, pay certain L.T. Machinery expenses as well as personal expenses of the Leggons. However, the evidence is insufficient to determine whether Mrs. Barden was a financial benefactor to the Leggons, albeit unwitting, or whether the Leggons and L.T. Machinery wrongfully benefitted [benefited] from an unauthorized use of Mrs. Barden's funds by Mrs. Leggon. Additionally, Mr. Leggon introduced evidence that L.T. Machinery checks totaling in excess of two hundred and seventy-five thousand ($275,000) dollars wound up in accounts held jointly by Mrs. Leggon and Anna Barden. While the court draws no conclusion that these payments were a misappropriation from the company, they do represent payment to Anna Barden and/or Joan Leggon at a time when Mrs. Barden, through her executrix, claims she advanced funds for the benefit of the corporation and Mr. Leggon. Whether some of these funds were wrongfully taken from L.T. Machinery by Joan Leggon and deposited into joint accounts with Anna Barden, or whether these checks represented a repayment by L.T. Machinery to Anna Barden for funds previously advanced has not been sufficiently proven either to demonstrate that the funds paid by Anna Barden were her own solely or simply amounted to a recirculation of L.T. Machinery funds.
The difficulty in assessing the plaintiffs claim is compounded by her lack of credibility as a witness. In 1991, Mrs. Leggon opened a joint account with her mother with the Fleet Bank in Connecticut. She claims that the initial deposit of forty-five thousand ($45,000) dollars came from Mrs. Barden. Mrs. Leggon CT Page 9452 testified that on September 17, 1991 she wrote a check on this account to cash in the amount of thirty-six thousand, two hundred seventy ($36,270.00) dollars. On the original of the check presented as plaintiffs exhibit 32 is the memo notation, "Loan to L-T Machinery Sales from Anna Barden." Plaintiff's Exhibit 32, Check No. 106. Mrs Leggon testified that she made that memo notation at the time she wrote the check as it was her habit to always make a memo of the purpose of checks she wrote at the time of the writing. However, five days later in this continuing hearing, the court received as evidence a copy of the check as it was processed by the bank. The copy does not contain the notation that was written on the original. cf. Plaintiff s Exhibit 51, photocopy of check no. 106. Obviously, the notation was made on the check after it was returned by the bank and not, as Mrs. Leggon testified, when the check was first written. To the court this was demonstrable evidence of Mrs. Leggon's unreliability as a witness.
In partial support of her claim that Anna Barden advanced funds to L.T. Machinery, Mrs. Leggon produced a document she prepared which lists the sum of seventy-three thousand ($73,000) dollars as loans from Anna Barden. cf. Plaintiff's Exhibit 28, Document captioned "Loans/Anna Barden:" The document indicates that on April 29, 1993 the .sum of ten thousand ($10,000) dollars was loaned. Next to this amount is the notation that it was a cashed certificate of deposit, used as emergency money for a building. Next, the document shows a payment of twenty thousand ($20,000) dollars, purportedly from the sale of Mrs. Barden's home in Florida and loaned for the purpose of buying slips A-46 and A-48. This is a reference to two of the dockominium slips purchased by Mr. Leggon. Finally, as to specific amounts, is note of the sum of thirteen thousand ($13,000) dollars which apparently was intended to assist in the purchase of an asset by the Leggons. While this document is evidence of funds paid by Mrs. Barden for the business and for Mr. and Mrs. Leggon, during her testimony Mrs. Leggon admitted that the total sum of forty-three thousand ($43,000) dollars was, in fact, repaid to Mrs. Barden. Also on this document is the notation that thirty thousand ($30,000) dollars was paid for 1994 personal expenses. From this notation the court is unable to discern whether the sum, if paid, was for the personal expenses of Mrs. Leggon, Mr. Leggon, or both.
Certainly it is clear to the court that while Mrs. Leggon had access to accounts in her name with Anna Barden she utilized sums CT Page 9453 from these accounts for her own personal needs and desires. For example, in March 1995, at a time Mrs. Leggon says her mother's assets were depleted by loans to L.T. Machinery and to Mr. Leggon, and her mother was so impecunious that she took some of her mother's jewelry to a pawn shop, she admitted that she used the sum of twenty-five hundred ($2,500) dollars belonging to her mother to pay Service Master to clean the Leggon home, and had the drapery in the marital home cleaned, both at her mother's expense at a time that her mother was, according to Mrs. Leggon, without sufficient funds for food.
Some other evidence that funds from Anna Barden were utilized to benefit the Leggons is found in a bookkeeping entry by L.T. Machinery Sales dated March 31, 1993. This document, captioned, "Loan Payable-A. Barden" shows that the sum of seventy-seven hundred and eighty ($7,780) dollars was paid on June 9, 1992 and the further sum of eleven thousand, six hundred and seventy ($11,670) dollars was paid on June 10, 1992. It shows further the following repayments: Six hundred ($600) dollars on July 21st, six hundred ($600) dollars on July 23rd. twenty-four hundred ($2,400) dollars on July 28th, five thousand ($5,000) dollars on September 26, 1992, and ten thousand, eight hundred and fifty ($10,850) dollars on August 11, 1992. The document states that the balance of the loan as of March 31, 1992 was "-0-". Plaintiff's Exhibit 56, Ledger Sheet from L.T. Machinery. While this document supports the notion that Anna Barden's money was utilized by L.T. Machinery, the leap from the amounts shown on this exhibit, and from Plaintiff's Exhibit 28, to the sums claimed by Mrs. Leggon is more than faith alone will support.
Mrs. Leggon further claims that Plaintiff's Exhibit 31 demonstrates that the sum of one hundred seventy-eight thousand, three hundred and sixty ($178,360) dollars was paid directly from Anna Barden to L.T. Machinery. The allegation fails the test of truth. The first item noted on this exhibit, check # 106 from the Fleet Account was made payable to cash and was, in fact, endorsed by Mrs. Leggon. The balance of the supporting documents contained as part of Plaintiff's Exhibit do not, without self serving notations, convince the court that they represent loans from Anna Barden paid directly to L.T. Machinery as claimed by Mrs. Leggon. On the claim brought by Joan Leggon as Executrix of the Estate of Anna Barton, the plaintiff has failed to sustain her burden of proof. Accordingly, judgment may enter for the defendant without costs. CT Page 9454
L.T. Machinery v. Joan A. Leggon
Mr. Leggon claims that while his wife had access to the books and records of L.T. Machinery, she diverted approximately four hundred thousand ($400,000) dollars from the business to accounts in her name and Anna Barden's. He claims that she forged checks, erased the name of payees on L.T. Machinery checks, substituted herself as payee, and wrote checks to herself on the L.T. Machinery account. He also claims that she opened a post of fice box into which she surreptitiously had company checks forwarded.
While Mrs. Leggon had access to the L.T. Machinery office, she handled the books and wrote checks for the company. Though Mr. Leggon did not report her as an employee to the State for unemployment purposes, it is clear that when Mrs.Leggon had access to L.T. Machinery, she was authorized to conduct banking transactions for the company. In 1993, 1994, and 1995, when Mrs. Leggon had authority to handle banking business for the company, she also enjoyed a power of attorney from her mother. It appears that she both withdrew funds from her mother's account with which she paid company bills and she diverted company funds into the account she shared with her mother. While she claims that these transactions demonstrate borrowing by the company from Mrs. Barden and repayment to her, it is the court's view that these transactions show no more than Mrs. Leggon's conduct in treating her mother's funds as her own, and in commingling company funds with her personal accounts.
On June 30, 1995, Mr. Leggon barred Mrs. Leggon from the business property. Thereafter, he employed a book keeper, Elaine Grenier, in an effort to reconstruct the company's books and to right the company's listing financial ship. Ms. Grenier found the company's books in disarray. Ms. Grenier worked under the supervision of Roy Lewis, a certified public accountant with an office in Wethersfield. Mr. Lewis testified that he began to provide accounting services to L.T. Machinery in October, 1995 in an effort to prepare the corporation's tax returns. In this context he supervised Ms. Grenier's reconstruction activities. Mr. Lewis determined that approximately one hundred sixty-seven thousand ($167,000) dollars flowed from L.T. Machinery to accounts in the name of Joan Leggon, Joan Leggon and Anna Barden, or were in L.T. Machinery checks cashed by Joan Leggon. Additionally, Mr. Lewis determined that there were business checks written to L.T. Machinery but diverted by Mrs. Leggon to accounts in her name alone or with Anna Barden in the total CT Page 9455 amount of approximately ninety-one thousand ($91,000) dollars. Finally, Mr. Lewis testified that he found checks on the company account totaling approximately fifty thousand ($50,000) dollars which were purported to have been written by Mr. Leggon to Mrs. Leggon but which, in fact, were written by Mrs. Leggon to herself.
These claims, however, do not lead to any particular factual conclusion. While Mrs. Leggon had access to the company books and bank accounts, Mr. and Mrs. Leggon both treated company funds as personal. Therefore, transfers by Mrs. Leggon of company funds from 1993 to 1995 into accounts in her name or with Anna Barden, or payment of Mrs. Barden's expenses with company funds simply demonstrates that company funds were used by Mrs. Leggon for personal purposes or withdrawn for her own use. Aside from the potential Federal and State income tax ramifications of these transactions, the personal use of company funds by Mrs. Leggon does not appear to have violated any contrary understanding with Mr. Leggon. Both accountants who had access to the company books for this time period testified that Mr. and Mrs. Leggon regularly commingled personal and company funds.
Nevertheless, evidence of Mrs. Leggon duplicity while she had access to the L.T. Machinery books is substantial. Mrs. Leggon changed the names of check payees from L.T. Machinery vendors to herself. Mrs. Leggon also diverted checks made payable to L. T Machinery to herself. As an illustration, in December, 1992, Mrs. Leggon diverted a check made payable to L.T. Machinery Sales for five thousand ($5,000) dollars by marking it "for deposit only" and depositing it into an account in her name jointly with Anna Barden. As another example. Mrs. Leggon changed the amount of checks written to her to increase the amount paid. Similarly, Mr. Leggon proved that during the same time period, Mrs. Leggon issued checks on the L.T. Machinery Bank of Boston and Mechanics Bank accounts in the aggregate amount of approximately one hundred seventy-seven thousand ($177,000) dollars. Many of these checks were made payable to Robert Leggon but countersigned by Joan Leggon. Indeed, in most instances, the court finds that Mrs. Leggon actually signed Mr. Leggon's name as maker. That is not to say, however, that the funds were converted to her sole use, or to uses exclusive of Mr. Leggon's needs or responsibilities.
There are certain aspects of Mrs. Leggon's conduct which clearly constituted a wrongful appropriation of L.T. Machinery funds. Checks written for one amount. and then changed and cashed CT Page 9456 by Mrs. Leggon for another amount, and checks initially made payable to L.T. Machinery but altered and taken by Mrs. Leggon represent funds wrongfully taken from the corporation. There is no basis for concluding that Mr. Leggon authorized his wife to divert checks made payable to L.T. Machinery into her own bank accounts, or that he authorized her to alter the amount of checks subsequently deposited into her accounts. From the evidence, the court concludes that Mrs. Leggon wrongfully altered company checks appropriating the sum of nine thousand, five hundred and forty-five ($9,545) dollars to herself, and she wrongfully appropriated to herself checks written or intended for L.T. Machinery in the aggregate amount of ninety-six thousand, five hundred and sixty-two ($96,562) dollars. Thus, the court finds that the plaintiffs have proven that from 1992 through 1995, Mrs. Leggon wrongfully appropriated to herself the sum of one hundred and six thousand, one hundred and seven ($106,107) dollars of L.T. Machinery funds without authorization from L.T. Machinery.
The set-offs and counterclaim filed by Mrs. Leggon are without merit. Mrs. Leggon has failed to sustain her burden of proof that she was an uncompensated employee of L.T. Machinery, that the company was unjustly enriched by her services, or that she was induced to perform uncompensated services by false misrepresentations concerning her status in the corporation. Similarly, she has failed to meet her burden of proof in regard to the essential allegations of her counterclaim.
Thus, in this matter, judgment may enter in favor of the plaintiff, L.T. Machinery, against Joan Leggon in the amount of one hundred and six thousand, one hundred and seven ($106,107) dollars without costs.
Robert E. Leggon v. Joan A. Leggon
Peter and Joan Leggon were married on October 24, 1959 in Scranton, Pennsylvania. They have one adult child who is approximately thirty-six years old, and a practicing physician. Mrs. Leggon's birth name was Joan Ann Frystack.
Mr. Leggon resided continuously in Connecticut for more than a year prior to the date on which this action commenced. He moved from the family residence in November, 1996, and resides at 500 Cold Spring Road in Rocky Hill in an apartment with a rental cost of fifteen hundred ($1,500) dollars a month. He is fifty-nine years old. Following completion of high school in 1957, Mr. CT Page 9457 Leggon moved to Connecticut where he began employment at Pratt and Whitney Aircraft. During the course of his employment, he took a number of continuing education courses related to his work. Mr. Leggon worked for Pratt and Whitney for approximately five years as a machinist, leaving to take employment with Acme Spring as its plant manager. He remained with Acme for approximately two years, when he left to start his own business. This venture was brief and was followed by employment with a company called Superior Electric for whom Mr. Leggon was employed as a salesperson. He remained with Superior for approximately five years, leaving in 1972. Thereafter, he was employed by the firm of Gilbert and Richards for a period of nineteen years selling industrial machines. In 1991, he left Gilbert and Richards to become an industrial machine distributor. Mr. Leggon began this business in the basement of the marital home, then moved to a rental facility in Plainville, and then, in 1992, relocated the business to its present location on Viet Street in New Britain. A diabetic, Mr. Leggon takes a daily regimen of insulin.
Mrs. Leggon moved from the family residence in February, 1996 and now resides in a mobile home on Pine Street in Plainville. This home, which was Mrs. Barden's residence, is mortgage free. For reasons unclear to the court, Mrs. Leggon also continues to pay rent of four hundred ($400) dollars a month for a mobile home she occupied in Taylor, Pennsylvania earlier during the parties' separation. She is forty-seven years old and a high school graduate. She is a recovering alcoholic who has been in recovery for approximately fifteen years. Mrs. Leggon testified that she has numbness in her left arm, no feelings in her fingers, and pain radiating from her neck, and that she has been told by an orthopedic surgeon that she may require surgery. This condition results from a February, 1996 assault on Mrs. Leggon by her husband. Additionally, she indicated that she suffers from allergies and asthma.
When Mrs. Leggon first came to Connecticut she worked as a secretary for approximately four months, and then she took employment with New Britain Machine Works, Inc., where she was employed until the company closed in 1982. When the business closed, Mrs. Leggon withdrew her small pension account and utilized the funds for family purposes. Mrs. Leggon then worked for an architectural firm as a secretary from 1983 until 1991 when she left the firm to begin work with L.T. Machinery. After Mrs. Leggon was ousted from L.T. Machinery in June, 1995, she was CT Page 9458 employed as a customer service representative for a company known as Magson Uniform earning approximately ten ($10) dollars an hour. This employment continued until February, 1996, when Magson's rental department closed. Since the, Mrs. Leggon has been unemployed.
When the parties first came to Connecticut, they lived in apartments in New Britain until they built a home at 39 View Street in Plainville in 1964.
The former marital residence on View Street is presently vacant and for sale with a listing price of one hundred and forty-nine thousand ($149,000) dollars. Since the property has been listed for sale, there have been two offers, one for one hundred and thirty-seven thousand, five hundred ($137,500) dollars and another for one hundred thirty-nine thousand and five hundred ($139,500) dollars, both of which were later withdrawn because of complications due to poor communications between the parties. The property is encumbered by a first mortgage with a principal balance of approximately one hundred and eight thousand ($108,000) dollars, a mortgage to Fleet bank with a balance of approximately twenty seven thousand ($27,000) dollars, judgment liens against Mrs. Leggon totaling approximately eight thousand, five hundred ($8,500) dollars, a tax lien against Mr. Leggon by the State for nineteen thousand, four hundred thirty ($19,430) dollars, an attachment by the Valley Federal Credit union against Mrs. Leggon for three thousand, one hundred forty seven ($3,147) dollars, and other property tax and sewer liens against the property. As a consequence, this property is essentially devoid of equity.
The parties own acreage located in Middle Smithfield, Pennsylvania which was purchased in the 1970's for fifty thousand ($50,000) dollars. At present, it is on the market with a listing price of one hundred seventy-five thousand ($175,000) dollars and no offers. Mr. Leggon testified to his belief that the property has a fair market value of one hundred fifty thousand ($150,000) dollars. Taxes on this property have not been paid since 1996, and the property is encumbered by a mortgage with a balance of approximately fifty-one thousand ($51,000) dollars. The sums generated by this borrowing were utilized by Mr. Leggon to repay his original debt associated with the start up of L.T. Machinery, to pay certain personal expenses, and to provide capital to L.T. Machinery. Thus, there is merit to Mrs. Leggon's claim that the mortgage on the Pennsylvania property represents funds utilized CT Page 9459 by Mr. Leggon for his own benefit. Presently there are taxes due on this property in the approximate amount of nineteen thousand, four hundred and fifty-eight ($19,458) dollars. During the pendency of this action, it was Mr. Leggon's obligation to pay these taxes.
The L.T. Machinery property on Viet Street, Plainville consists of two parcels containing an aggregate total of eleven thousand, three hundred(11, 300)square feet of office and warehousing space. This property is in the name of Leggon Realty, an entity owned jointly by Mr. and Mrs. Leggon. It was purchased in May, 1994 for approximately two hundred and twenty-seven thousand ($227,000) dollars. Mr. Leggon's tax return for the calendar year 1996 shows that he was paid gross rent of eighty-four thousand, four hundred and fifty-three ($84,453) dollars from L.T. Machinery for its use of the Viet Street properties, and that his rental income, after payment of mortgages, taxes, and depreciation, was thirty four thousand, three hundred and ninety-five ($34,395) dollars. Peter Marsele, an appraiser retained by Mrs. Leggon, testified that the combined fair market value of these properties is approximately three hundred and fifty-six thousand ($356,000) dollars. The court accepts Mr. Marsele's appraisal as an accurate assessment of the value of the Viet Street properties. There are three mortgages on these properties totaling approximately three hundred and thirty thousand ($330,000) dollars. While the first mortgage, in the principal amount of two hundred forty-eight thousand ($248,000) dollars, is a personal obligation of Mr. and Mrs. Leggon, the two additional mortgages are commercial loans in the name of the corporation in which the business property was given as collateral.
The parties own three dockominioms in Stonington. Connecticut. Mr. Leggon purchased the first dockminium for sixty-seven ($67,000) thousand dollars as a docking place for a motor yacht owned by the parties. Subsequently, Mr. Leggon purchased two additional units for ten thousand ($10,000) dollars apiece. Mr. Leggon testified that he has been offered fifteen thousand ($15,000) dollars for each unit and that he is unwilling to sell at that price because he believes they are each worth approximately twenty thousand ($20,000) dollars. Nevertheless, at trial, the parties stipulated that the combined value of the three dockominiums is forty thousand, five hundred ($40,500) dollars. The debt associated with all three units is twenty-seven thousand ($27,000) dollars. In addition, two of the units were CT Page 9460 used as additional security for a business loan, resulting in an additional blanket mortgage of two hundred and forty-eight thousand ($248,000) dollars covering both the dockominiums and the Viet Street property in New Britain.
While the mobile home occupied by Mrs. Leggon remains an asset of her mother's estate, she is the estate's sole beneficiary. On her affidavit, Mrs. Leggon posited the value of this home as sixteen thousand ($16,000) dollars, and she indicated that it is encumbered by liens totaling more than twice that amount. As a consequence, the mobile home has no equity.
In addition to the parties' real property, Mr. and Mrs. Leggon hold title to a 1986 Diesel-powered Viking Motor Yacht, named the "Lady Joan", which they purchased for one hundred ninety thousand ($190,000) dollars in 1993. While the court did not hear expert opinion concerning the value of the "Lady Joan", the court received as evidence a letter, dated June 5, 1996, from Mr. Leggon's (former) attorney in which he suggested that the Power Boat Guide for that year indicated a value of two hundred and thirty-five thousand ($235,000) dollars for the yacht. During the winter of 1997-1998, contrary to court order that the boat remain in Connecticut waters, Mr. Leggon removed the boat to Florida. He paid approximately forty-five hundred ($4,500) dollars for the boats storage and maintenance during this period. Pursuant to this court's order, the boat has now been returned to Connecticut. Aside from moving it to and from Connecticut, Mr. Leggon testified that he has not used the boat in the past two years.
Under the parties' present financial circumstances, ownership of an expensive motor yacht and the dockominiums is beyond their reasonable means. It is practicable and fair that they be sold and converted into usable funds.
In addition to the Viking motor yacht, Mr. Leggon is in possession of a 16 foot sportscraft motor boat with an outboard motor. This boat is currently stored at the L.T. Machinery property.
Mr. Leggon is the sole shareholder in L.T. Machinery, Inc. This business was started in May, 1991, and incorporated on August 26, 1991. While there was some dispute concerning stock ownership of the corporation, it is clear from the corporate papers that the stock has always been in Mr. Leggon's name. It is CT Page 9461 equally clear that the company's first accountant, Ralph Beverage, was under the impression from Mr. Leggon that he and Mrs. Leggon shared stock ownership on an equal basis. Thus, Mr. Beverage noted on the three Federal Corporate Income Tax Returns he prepared that Mr. and Mrs. Leggon each owned fifty percent of the stock. At present, the business is foundering. In November, 1997, the business lost its principal account, which provided in excess of 70% of its gross revenue, and another manufacturer which accounted for an additional 10% to 15% of its gross revenue.
Mrs. Leggon claims that Mr. Leggon was paid twice by the corporation for funds he provided at the company's start up and that funds borrowed to repay the start up loan were, in some part, used by Mr. Leggon for his personal benefit. While the evidence on this point is somewhat convoluted, it does not support Mrs. Leggon's claim that her husband was repaid twice. It appears that when Mr. Leggon originally went into business, he borrowed the sum of fifty thousand ($50,000) dollars and contributed that sum into the corporation. Subsequently, Mr. Leggon borrowed the sum of one hundred thousand ($100,000) dollars from the First Valley Bank, using the parties' property in Pennsylvania as collateral, and applied the proceeds from this loan to repay the initial loan with interest. Additionally, it appears that Mr. Leggon utilized seventy-five hundred ($7,500) dollars from this borrowing to pay for personal dental work, and he paid nineteen thousand ($19,000) dollars into the corporation. As an asset, L.T. Machinery has little value. For the fiscal year ending June 30, 1997, the corporation's tangible assets were overmatched by it's debt. Its financial statement reflected assets of one hundred seventy-nine thousand ($179,000) dollars gross of depreciation, consisting of eleven thousand, two hundred ($11,200) dollars in cash, approximately sixty thousand ($60,000) dollars in office equipment and computers, and one hundred eight thousand ($108,000) dollars in leasehold improvements. Against these assets, the financial statement reflected current liabilities of approximately one hundred ninety-four thousand ($194, 000) dollars. Because of Mr. Leggon's poor business practices, L.T. Machinery lost it's two greatest accounts. As a consequence, the prospects for this business as an ongoing entity are questionable. On the other hand, Mr. Leggon has a track record of several years' success selling industrial machinery. While L.T. Machinery, as a sales vehicle, may not be viable, Mr. Leggon's skills have been proven in the past to be transferable.
CT Page 9462 During the course of the marriage, Mr. Leggon purchased an 1988 BMW motor vehicle which is stored at the business property. He claims that the vehicle is in poor mechanical condition and that he does not operate it. In fact. it appears that Mr. Leggon drives an automobile leased in the name of Elaine Grenier, an employee of L.T. Machinery. Mr. Leggon acknowledged that he is the primary operator and makes the monthly lease payments for this vehicle even though it is leased to Ms. Grenier. On the other hand, Mrs. Leggon presently operates a truck which has traveled approximately three hundred thousand miles in its seventeen year lifetime.
Earlier in the marriage, the Leggons owned a lakeside home in Pennsylvania. When this property was sold in 1988, the Leggons netted approximately fifty-nine thousand ($59,000) dollars. Check register notations provided by Mrs. Leggon demonstrate that shortly after the proceeds from the sale were realized, Mr. Leggon expended approximately thirty eight thousand ($38,000) dollars to purchase the BMW automobile, and, by and large, the balance of the sale proceeds for his personal interests and needs. The BMW he purchased is the vehicle that Mr. Leggon has stored at the L.T. Machinery premises and which he reasonable.
The plaintiff has approximately seventy-five thousand ($75,000) dollars in a retirement annuity at the United Trust Company. Aside from this amount, neither party has any retirement assets.
Mrs. Leggon claims that when she moved from the family residence she left valuable jewelry behind and that when she returned to the property, the jewelry was missing. She claims that since her husband was in possession of the property, he should be responsible to repay her. She claims her jewelry was worth approximately fifty thousand ($50,000) dollars. This unsubstantiated claim is devoid of credible proof.
The marriage has been troublesome for years. Indeed, this is the third marital dissolution action between the parties. In 1978, Mr. Leggon moved from the family home for a period of time and in February, 1978, Mrs. Leggon commenced a marital dissolution action which was later withdrawn. Mrs. Leggon also brought and withdrew a subsequent action.
While Mr. Leggon complained that his wife drank excessively, rarely cleaned house, and occasionally behaved in bizarre ways CT Page 9463 while intoxicated, he minimalized his several extramarital affairs and he denied that he had been physically abusive to his wife except on one occasion. The wife's drinking was a manifestation of her alcoholism for which she received inpatient treatment. She has been in recovery for more than fifteen years. Though her behaviors while intoxicated were, in fact, unusual, her failings did not justify Mr. Leggon's seriatim affairs or his abuse of Mrs. Leggon. Mr. Leggon conducted one extra marital affair after the other throughout the marriage beginning in 1977. Additionally, the court finds that Mr. Leggon was physically abusive to his wife to a greater extent than he admits, though to a lesser extent than she claims. The court finds specifically that Mr. Leggon physically assaulted Mrs. Leggon on February 25, 1996 at the family residence. She testified that Mr. Leggon grabbed her wrists and dragged her into the bedroom where he threw her down on the bed and began to choke her until he passed out. The plaintiff offered as corroborating evidence the testimony of Paula Janeiro, her hair dresser, who indicated that shortly thereafter she noticed bruise marks on Mrs. Leggon's neck. The court found this witness credible. Mrs. Leggon claims that prior to February 1996, she had experienced no neck discomfort and she asserts that her present neck discomfort relates to this incident. In a separate count in her marital dissolution complaint, she seeks compensatory damages on the basis of a marital tort. In support of this claim, Mrs. Leggon submitted a medical report from Robert C. Pepperman, M.D., who stated, in part, "My feeling was that the neck injury did cause her to have a cervical radiculopathy that has irritated the cervical nerve roots which were already entrapped from osteoarthritis which was a pre-existing condition. "Defendant's Exhibit AAA 3, Report of office visit dated December 17, 1997. In this report, Dr. Pepperman also indicated that Mrs. Leggon has reached maximum medical improvement, that the has a 5-10% permanent partial impairment rating for the soft tissues of her cervical spine, and that there is a possibility of cervical surgery somewhere in the future for her cervical spinal stenosis. Id. An MRI conducted on Mrs. Leggon on August 25, 1997 revealed some degenerative disc disease. In part, the report states: "The spondylitic changes are seen to result in central stenosis at C4-5 through C6-7. with the greatest degree of stenosis present at C5-6." cf. Defendant's Exhibit AAA1, Report dated August 26, 1997 from Jonathan D. Kirsch, M.D.
Apart from this incident, Mrs. Leggon claimed that on numerous occasions Mr. Leggon assaulted her, that he pulled CT Page 9464 clumps of her hair out, broke several of her fingers, broke her ribs and broke her nose several times. She claimed that her husband slapped her across the face so hard she had skin hanging from her mouth, and that she once lost hearing in her left ear as a result of being slapped. For all the claims, except the February 1996 incident, Mrs. Leggon presented no medical substantiation even though she stated that on several occasions she sought medical treatment. She claimed that none of the records was available to her. Given the seriousness of the allegations and the credibility issues attending Mrs. Leggon as a witness, the court draws no conclusions about these various alleged incidents, other than the one which the court finds did occur on February 25, 1996. From that assault, Mrs. Leggon did sustain permanent and disabling injuries at the hands of her husband.
The plaintiff seeks compensatory damages for the physical injuries inflicted upon her by Mr. Leggon. The request for monetary damages is not cast as either an alimony or property distribution demand but is separately asserted in the Fifth Count of the Second Amended Cross Complaint dated September 4, 1997. While it is generally better policy not to join marital tort claims with a marital dissolution action, as the purposes for relief differ in each form of action, (cf. Delahunty v.Massachusetts Mutual Life Insurance Co., 236 Conn. 582 [1996]) Mr. Leggon has not asked the court to strike the defendant's claim for monetary damages, and both parties expressed a desire to have all financial issues between them decided as part of this combined hearing. Misjoinder of issues does not implicate the jurisdiction of the court. Accordingly, under the special circumstances of these parties and these actions, the court has decided to consider Mrs. Leggon's request for compensatory damages as a free standing claim.[2] The court finds that as a result of Mr. Leggon's assault on Mrs. Leggon on February 25 1996, she sustained physical injuries, disabilities, and pain and suffering as evidenced by her testimony and the corroborating medical documentation. For these consequences, she is entitled to monetary damages from Mr. Leggon in the amount of forty thousand ($40,000) dollars.
Orders
The court finds that the marriage has broken down irretrievably. Accordingly, a decree may enter dissolving it on that basis. CT Page 9465
With respect to alimony, the plaintiff claims that he is, in essence, without employment because he has lost two accounts which comprised nearly ninety percent of his business. The plaintiff, however, has a demonstrated earning capacity as a salesperson of industrial machinery. Tax returns filed by the plaintiff indicate that in 1996, he earned approximately fifty-two thousand ($52,000) dollars, in 1995, approximately fifty-seven thousand ($57,000) dollars, in 1994, approximately fifty-eight thousand ($58,000) dollars, and in 1993, approximately sixty-six thousand ($66,000) dollars. On the other hand, the defendant has searched without success for employment as a book keeper since 1996. Her tax returns reflect that in 1995 she grossed four thousand, for hundred and ninety-four ($4,494) dollars, and in 1996 she earned two thousand, four hundred ($2,400) dollars. While she does have the ability to perform office work, she is limited by her age and lack of education. For the past few years, while this litigation has been pending and there has been an alimony order, Mrs. Leggon has been in transition. From documentation she provided the court, it appears that she intends to relocate to Pennsylvania where she seeks employment as a home health aide. She indicated that payment for this employment averages approximately five dollars and fifty cents ($5.50) an hour. The plaintiff is ordered to pay to the defendant indefinite periodic alimony of three hundred and fifty ($350) dollars a week. The provisions of C.G.S. 46b-86 (b)shall pertain to this order. In addition, the defendant shall be entitled to continue on any health insurance policy available through the plaintiff's employment at L.T. Machinery, at her expense, for so long as such is available to her.
The family residence shall be sold immediately and the proceeds divided equally after payment of closing costs and the mortgages on the property. The party against whom liens or judgments have been filed on this property shall be responsible for those obligations and shall hold the other harmless therefrom. In the interim, the court expressly makes no order with regard to payment of the primary mortgage on this property.
The dockominium shall be sold immediately and the proceeds, after closing costs and payment of the mortgage which relates to the purchase of the first dockominium, shall be divided equally. It shall be Mr. Leggon's responsibility to secure a release of mortgage for the blanket mortgage covering two of the dockominiums as this security relates to a L.T. Machinery CT Page 9466 obligation. Additionally, it shall be Mr. Leggon's responsibility to pay taxes and interest due and owing at the time of closing on the dockominiums.
Mr. Leggon shall assign to Mrs. Leggon all of his right, title. and interest in and to the acreage the parties own in Smithfield, Pennsylvania, and he shall assume and pay the mortgage on such property in accordance with its terms and hold Mrs. Leggon harmless therefrom. Additionally, he shall pay the accrued taxes and interest due on this property within forty-five days of this Memorandum.
Mrs. Leggon shall assign to Mr. Leggon all of her right, title, and interest in and to the business property located on Viet Street in Plainville. Mr. Leggon shall assume the mortgages associated with this property and shall hold Mrs. Leggon harmless therefrom.
Mr. Leggon shall assign to an IRA in the name of Mrs. Leggon the sum of thirty seven thousand, five hundred ($37,500) dollars from his retirement annuity. Within thirty days of this order, Mrs. Leggon shall inform Mr. Leggon of the name and address of the financial institution, and the IRA account number to which she desires to have the funds transmitted. Mr. Leggon shall cause the transfer within two weeks of receiving this information.
Mr. Leggon shall be entitled to sole ownership of the stock in L.T. Machinery. He shall hold Mrs. Leggon harmless with respect to any indebtedness of the corporation and for any liabilities incurred by the corporation. Title of the BMW shall be transferred by Mr. Leggon to Mrs. Leggon immediately. The vehicle, together with all its accessories, shall be delivered to Mrs. Leggon within two weeks of this judgment to a location she designates.
The Viking Motor Yacht "Lady Joan" shall be immediately listed for sale with Viking Yachts at a listing price recommended by Viking. Once the vessel is sold, the gross proceeds net of selling commission shall be divided equally by the parties. The plaintiff shall pay any storage or other yacht-related fees or liens from his share of the proceeds. In the interim. the yacht is not to be removed from it's present docking site in Stonington by either party. Cost of maintenance and dockage shall be the sole responsibility of the plaintiff pending sale. CT Page 9467
The plaintiff shall be entitled to ownership of the 16' motor boat and outboard motor presently in his possession.
Except as provided for herein, each party shall retain ownership of the assets each possesses and each shall be separately liable for the debts indicated on his and her financial affidavits and any other debts either has incurred during the separation of the parties.
In the event the defendant successfully prosecutes a claim for jewelry she alleges she 1' owned and claims to be missing from the marital home, she shall be solely entitled to the insurance check.
In the event the parties are unable to agree upon listing and selling prices for the assets which have been ordered sold, the court retains jurisdiction to make any further orders which may be necessary to effectuate the intent of these orders.
Mrs. Leggon is awarded the sum of forty thousand ($40,000) dollars as monetary compensation for the injuries she sustained as a result of Mr. Leggon's February 25, 1996 assault on her.
Mrs. Leggon seeks an award of fifty thousand ($50,000) dollars in counsel fees. In support of this claim, the defendant submitted an affidavit of counsel detailing her work effort totaling 312 hours at an hourly rate of one hundred fifty ($150) dollars and itemizing out-of-pocket expenses. Based on the criteria set forth in C.G.S. 46b-62, and mindful of its other orders in the marital dissolution action, the court orders the plaintiff to pay counsel fees to the defendant in the amount of twenty-five thousand ($25,000) dollars, payable by December 31, 1998, or earlier in the event that Mr. Leggon becomes entitled to the disbursement of funds from the sale of assets as ordered herein. Counsel for Mrs. Leggon may seek security for the payment of these fees from the sale of any of the assets as hereinbefore ordered.
In formulating these orders, the court has carefully considered the statutory criteria set forth in C.G.S. 46b-81,46b-82, and 46b-62 and relevant decisional law.
Counsel for the plaintiff in each file shall prepare judgment file. CT Page 9468
Bishop, J.